UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY WEST,

                    Petitioner,                Case No. 15-11218
                                              Hon. Arthur J. Tarnow

v.

MARY BERGHUIS,

                    Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS
CORPUS, GRANTING A CERTIFICATE OF APPEALABILITY, AND
GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Petitioner Anthony West filed this application for a writ of habeas corpus pursuant to

28 U.S.C. § 2254. Petitioner was convicted after he pled guilty in the Wayne Circuit Court

to second-degree, MICH. COMP. LAWS § 750.317, and  possession of a firearm during the

commission of a felony, MICH. COMP. LAWS § 750.227b. In accordance with his plea

agreement Petitioner was sentenced to 20 to 40 years for the murder conviction and a

consecutive 2 years for the firearm offense.

The petition enumerates six claims: 1) Petitioner was denied the effective assistance

of appellate counsel who failed to file a direct appeal, 2) appellate counsel failed to provide

Petitioner with discovery materials, 3) Petitioner was denied the effective assistance of trial

counsel who failed to investigate and pursue a self-defense or accident defense, 4) the state

court erroneously rejected Petitioner's ineffective assistance of trial counsel claim on the

basis that his guilty plea waived review, 5) Petitioner's plea was involuntary due to his

counsel's ineffectiveness, and 6) Petitioner's trial counsel was ineffective for revealing confidential calls he made from jail.

The Court will deny the petition because the claims are without merit. The Court will, however, grant Petitioner a certificate of appealability and grant Petitioner permission to proceed on appeal in forma pauperis.

## I. Background

This case involves the April 15, 2009, fatal shooting of Brian Garner. Petitioner was originally charged with first-degree murder, possession of a firearm by a felon, commission of a felony with a firearm, and with being a third-time habitual felony offender.

A preliminary examination was held two weeks after the shooting. The parties stipulated that the victim died from a single gunshot wound to the back. Jasmine Godboldo testified she was the victim's fiancé. Misha Starks was Godboldo's mother, and Petitioner was Starks' boyfriend. The four resided together at a house on Evergreen in Detroit.

Godboldo testified at the preliminary hearing that on the evening of April 15, 2009, Petitioner and Garner engaged in a verbal altercation after Petitioner accused Starks of cheating on him. Garner escorted Petitioner from the house, and the two continued to argue outside. Garner was not armed.

According to Godboldo, when Petitioner and Garner reached the sidewalk Petitioner said, "I'm not a punk ass nigga" and pulled out a handgun. Dkt. 9-2, at 13. Garner jumped back and held his hands in the air. Id., at 16. Petitioner then pointed the gun at Garner and fired it five times. Petitioner ran away from the scene. 9-1-1 was called, but Garner died of

his wounds.

On cross-examination, retained counsel, Robert Slameka, elicited testimony that Petitioner and Starks frequently fought, and Petitioner was previously thrown-out of the house. Godboldo admitted that she saw Garner push Petitioner just before Petitioner pulled out the gun. Counsel noted that in her statement to police Godboldo said she only heard three shots, not five. Godboldo explained that she initially told police that Petitioner first fired three shots, ran, then turned around and fired two more shots. She testified at the hearing that there was no pause in the shots and her statement to police was mistaken.

At a pretrial hearing held on August 14, 2009, defense counsel indicated that the prosecutor offered a plea bargain to second-degree murder and felony-firearm, with a sentence agreement of "23 years plus 2," but Petitioner declined the offer. Defense counsel complained that Petitioner had made numerous phone calls to a primary witness "with an attempt to massage testimony." Dkt. 9-6, at 4. The prosecutor provided the taped phone conversations to defense counsel, and defense counsel indicated his frustration with Petitioner's conduct: "The real problem with this case now, is this, my client is claiming it's either self-defense or accident. There are no witnesses that support that. Meaning, he would be the only one who could testify to that. Obviously, his testimony is going to be impeached dramatically by what he said that's recorded." Id., at 4. "And I've tried, Judge, honestly, to help him. It's impossible." Id., at 5.

At that point Petitioner personally addressed the court, stating that he did not think he said anything wrong on the phone to the witness. Petitioner also complained that he had not

3

had an opportunity to go over the discovery packet. Id., at 6. Counsel responded: "I sat in the jail with him and read to him, verbatim, every period, every sentence, every word of every witness report. I did that. . . . He has one witness, a Ms. Skinner, who is going to be the greatest witness in the world. Unfortunately, it doesn't help him, and I've read that to him and said, here it is. So when he says he hasn't had a chance to know what the witnesses say, that's utterly false." Id., at 6-7. Petitioner maintained that he did not know what was in the discovery packet. Id., at 7.

Three days later, on August 17, 2009, another pretrial hearing was held. Defense counsel indicated that the prosecutor would not reduce his plea offer, and Petitioner indicated his desire to go to trial instead. Dkt. 9-7, at 1. Petitioner believed that a better offer was forthcoming, but defense counsel indicated that the prosecutor stated that he would not make a better offer. Id., at 2. The matter was then set for trial to begin on October 5, 2009.

On the date set for trial, a plea bargain was finally struck. Dkt. 9-8. Petitioner was placed under oath. The Court informed Petitioner that he was charged with first-degree murder which carried a sentence of life imprisonment. Id., at 6. The Court indicated that the plea agreement called for him to plead guilty to second-degree murder with a sentence of 20 to 40 years plus 2 years for the firearm offense. Id., at 6. Petitioner indicated his understanding. The Court informed Petitioner of the rights he would be waiving by entering his plea, and he indicated his understanding. Id., at 7-8. Petitioner agreed that his plea was not the result of promises or threats not disclosed to the court. Id., 7.

Petitioner then testified that on April 15, 2009, he shot Brian Garner with a gun. Id.,

4

at 8. Petitioner testified that he did so with the intent to kill him or cause great bodily harm. Id., at 9. The court found that Petitioner's plea was knowingly, voluntarily, and understandingly made. Id., at 10.

At the sentencing hearing, Petitioner indicated his remorse for killing the victim. Dkt. 9-9, at 11-12. He also indicated that the victim attacked him and that the shooting was an accident. Id., at 12.

Petitioner was appointed appellate counsel who missed the deadline for filing a motion to withdraw the plea. Instead, on October 20, 2010, appellate counsel filed a motion for relief from judgment, asserting that Petitioner was deprived of the effective assistance of counsel when counsel failed to investigate and present a self-defense or accident defense instead of threatening him that he would be convicted of first-degree murder if he did not plead guilty.

The trial court denied the motion by order dated May 16, 2011, Dkt. 9-11. The court found that Petitioner's claims were without merit because Petitioner's plea was voluntarily, knowingly, and understandingly made. Id., at 4. The court further found that Petitioner had failed to demonstrate that his counsel was ineffective. Id., at 4.

On April 19, 2012, Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals. On September 19, 2012, the Michigan Court of Appeals denied the delayed application. Petitioner then filed an application for leave to appeal with the Michigan Supreme Court. On October 28, 2013, the Michigan Supreme Court remanded the matter back to the Michigan Court of Appeals for reconsideration under the standard

5

applicable to direct appeals. The Michigan Supreme Court noted that Petitioner's appellate counsel had failed to timely file a motion to withdraw the plea, and failed to file a timely appeal in the Michigan Court of Appeals, depriving Petitioner of his direct appeal as a result of constitutionally ineffective assistance of appellate counsel. *People v. West*, 838 N.W.2d 559 (Mich. Sup. Ct. Oct. 28, 2013).

On December 5, 2013, the Michigan Court of Appeals issued an unpublished opinion denying Petitioner's application for leave to appeal, finding in part that Petitioner's valid guilty plea waived his claim of ineffective assistance of counsel. *People v. West*, 2013 WL 6633985 (Mich. Ct. App. Dec. 5, 2015). Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, but it was denied by standard order. *People v. West*, 847 N.W.2d 628 (Mich. Sup. Ct. June 24, 2014).

Petitioner then commenced the present action. The Court appointed Petitioner counsel and ordered discovery. Counsel for Petitioner filed a supplemental brief, supported by police reports and other materials available to defense counsel prior to trial proceedings. Dkt. 17.

Among the items submitted is a statement made by Andrea Skinner to police on May 3, 2009. Id., Exhibit A, at 1. Skinner told police that she was sitting in her car which was parked next door to the scene of the shooting. She saw the two men arguing for about three minutes. Skinner told police:

> Then the guy that got shot started walking back towards the house but the shooter said something to him that made him turn around again and confront the shooter. . . . They had a couple more words then the victim grabbed the shooter by the collar with both hands and was pushing him towards Evergreen. The victim was saying "can't no body fuck with me." They got to the body

6

(sic?) of their driveway and on to my grass. Then the victim let him go. He takes a step back. Then the shooter pulls out a gun. The victim had his hands up out to his sides. The shooter fires the gun three times. After the third shot I got out of my truck and ran to the backyard of my house and called 911. Then I came back to the front and saw the shooter just standing still over the victim. After around twenty seconds the shooter ran towards Seven Mile.

Id., at 1.

Skinner also told police that she never saw the victim with a weapon. Id., at 2. She said the only time the victim assaulted the shooter was when he had him by the collar and "was shaking him." "It was like the victim was playing with a doll." Id., She saw Petitioner aim the gun at the victim's mid-section. Id.

Petitioner also made a statement to police. Id., Exhibit B. Petitioner told police the victim pushed him to the ground, picked him up, and shook him. Petitioner started to walk away but the victim came at him again. Petitioner explained: "I had a gun in my pocket and I wanted to get him off of me so I started shooting. I thought he was going to hurt me." Id., at 1. Petitioner stated that he was not trying to hit the victim, and he was just trying to scare him. Id., at 2.

Petitioner also filed a statement by Gregory Morris, an investigator for the Federal Defender's Office. Id., Exhibit C. Morris's statement indicates that he spoke with Mark Phillips on January 4, 2016. Phillips is a life-long friend of Petitioner, and he retained Robert Slameka to represent Petitioner. Id., at 1-2. Phillips told Morris that he paid Slameka $10,000, and was told that he would need an additional $7,500 to ensure that Petitioner would be sentenced to 10 to 15 years. Slameka later informed Phillips that because the

autopsy showed that the victim was shot in the back, Petitioner would have to take a plea deal with a 20 year minimum sentence. Id., at 2.

Phillips states that he also spoke with Ms. Skinner, and she told him that Slameka never spoke with her. Skinner told Phillips that the victim was "all over" Petitioner "shoving him down the driveway, almost to Evergreen, before he was shot." Id., at 2. When the victim grabbed Petitioner, Petitioner said, "I ain't trying to fight nobody." Id., at 3.

Finally, counsel for Petitioner filed Michigan Attorney Discipline Board records indicating that Slameka has been formally admonished on ten occasions, reprimanded on four occasions, and suspended from the practice of law twice. Id., Exhibit D.

Petitioner's initial pleading also contains additional documents from the police investigation. Brianna Williams made a statement to police on May 3, 2009. Dkt. 1, at 99. She stated that she was seated in the car with Skinner when the incident occurred. She saw both men emerge from the house arguing. She saw the victim shake Petitioner after Petitioner said something to him. Williams stated: "The tall guy let go of the shorter guy and it looked like the taller guy was going to hit the shorter guy. Then the shorter guy pulled out a gun and started shooting." Id. Williams said "it looked like" Petitioner was pointing the gun towards the ground. Id. She heard Petitioner tell the victim that he did not want to fight because the victim was just a kid. Id., at 100.

Mesha Starks gave a sworn statement pursuant to an investigative subpoena on April 17, 2009. Dkt. 1, at 110. Starks testified regarding the initial argument and how the victim escorted Petitioner from her house. Id., at 111-127. When Petitioner attempted to walk back

8

towards the house, the victim pushed him. Id., at 130-31. Starks explained: "[Petitioner] pulled the gun out of his right pocket because [the victim] had pushed him. [Petitioner] stumbled back. He reached in his right pocket. He said I'm no, no, no, I'm not no punk-ass nigger. [The victim] was standing right there in front of him. When [the victim] realized he was reaching in his pocket, [the victim] stepped back, threw his hands up. . . . [Petitioner] pulled the gun out. He said I'm no punk-ass nigger. He was like boom, boom, boom, boom, boom, boom, and he shot towards the ground. I never knew [the victim] was hit." Id., at 134. The victim walked away then lied down in the street. Id., at 136.

Starks confirmed, however, that in her first statement to police she said that Petitioner pointed the gun at the victim when he fired it. Id., at 140. She said the victim was standing three or four feet away from Petitioner when he was shot. Id., at 142. The victim stepped back when Petitioner pulled out his gun. Id., at 148-49.

Jasmine Godboldo also gave a sworn statement pursuant to an investigative subpoena on April 17, 2009, Dkt. 1, at 208. She likewise testified regarding the argument leading up to the shooting. Id., at 209-226. She described how the victim escorted Petitioner out of the house. Id., at 226. She heard the victim tell Petitioner that he could not treat the women disrespectfully. Id. Petitioner then pulled his gun out from somewhere under his shirt as he was stumbling off the curb. Id., at 227. Godboldo said: "He pointed the gun. They were at close range. They were standing very close to each other. . . . Maybe two feet." Id., at 227. "[The victim] puts his hands up as if he surrenders after the shots had been off, after this to look like he's in shock or he give up. And [the victim] walks in the middle of street and lays

9

there. He doesn't fall. He just lays." Id., at 228. "I saw the gun pointing dead at [the victim] hitting him in the chest." Id., at 229. Godboldo testified that when the victim saw the gun he put his hands up and was beginning to back away. Id., at 230. She heard five shots and believed that the victim was struck twice. Id.

Godboldo confirmed that in her first statement to police she said: "When they got to the end of the driveway, [Petitioner] turned around and said something to [the victim]. I couldn't hear what [Petitioner said], but then, then he pushed [the victim], and [the victim] pushed him back. And then [Petitioner] pulled out his pistol and shot [the victim]. He fired three shots." Id., at 235. She then heard two additional shots after she ran inside. Id.

Godboldo again claimed that the pause between shots was a mistake on her part, and that the shots all occurred together. Id., at 236. She saw Petitioner point the gun at the victim when he fired. Id., at 237-38. The victim did not push or attack Petitioner first; Petitioner pushed the victim, the victim pushed him back, and then Petitioner shot the victim. Id., at 239. Godboldo did not see the victim shake Petitioner, nor did he push Petitioner to the ground. Id., at 240.

## II. Standard of Review

This habeas petition is reviewed under the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). Under AEDPA, a federal court cannot grant habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding unless the state adjudication of the claim either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86 (2011), (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

To obtain relief under § 2254(d)(2), a petitioner must show an unreasonable determination of fact and that the resulting state court decision was "based on" that unreasonable determination. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2012).

### III. Discussion

### A. Ineffective Assistance of Appellate Counsel

Petitioner's first and second claims assert that his appellate counsel provided ineffective assistance of counsel by failing to file a timely motion to withdraw the plea or a timely direct appeal in the Michigan Court of Appeals. He also claims that appellate counsel failed to provide him with discovery materials.

The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel on direct appeal. See *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Carpenter v. Mohr*, 163 F.3d 938, 946 (6th Cir.1998). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. 466 U.S. at 687. Second, the petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair appeal. *Id.*

12

Here, although Petitioner's appellate counsel performed deficiently by failing to timely pursue a direct appeal on behalf of Petitioner, the Michigan Supreme Court caught the error and ordered the Michigan Court of Appeals to consider Petitioner's underlying substantive claims as if leave to appeal had been granted. The Court of Appeals then issued a decision rejecting Petitioner's claims.

Petitioner has failed to demonstrate that he was prejudiced by his appellate counsel's deficient performance because the state courts ultimately provided Petitioner with direct appellate review of his claims. Compare *Hollin v. Sowders*, 710 F. 2d 264, 265-67 (6th Cir. 1983)( appellate counsel's failure to perfect appeal did not prejudice habeas petitioner where state court's ruling on petitioner's motion for post-conviction relief, which was filed by new counsel, granted him an adequate substitute for direct appellate review); *Bair v. Phillips*, 106 F. Supp. 2d 934, 938, 943 (E.D. Mich. 2000) (same). Therefore, neither of Petitioner's first two claims merit relief.

## B. Ineffective Assistance of Trial Counsel

The Court interprets Petitioner's third, fourth, fifth, and sixth habeas claims to assert that his trial counsel was ineffective for failing to investigate and pursue a self-defense or accident defense instead of coercing Petitioner into entering into a plea bargain, and by revealing private communications made by phone from jail. He also asserts that the Michigan Courts erred by finding that his guilty plea waived his claims.

Claims about the deprivation of constitutional rights that occur before the entry of a

13

guilty plea are, in fact, foreclosed by a valid guilty plea. See *United States v. Broce*, 488 U.S. 563, 569 (1989); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973).

> The United States Supreme Court has explained:
>
> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [constitutional standards].

*Tollett*, 411 U.S. at 267. A defendant who pleads guilty generally waives claims that arose before his plea. In such a case, the court's inquiry is limited to whether the plea was knowing, intelligent, and voluntary. See *Broce*, 488 U.S. at 569. The question here, therefore, is whether counsel's alleged antecedent ineffectiveness in failing to investigate and pursue a self defense or accident defense rendered Petitioner's plea involuntary. See *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985).

As stated, a violation of the Sixth Amendment right to effective assistance of counsel is established where an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. In guilty-plea cases, the performance-prong requires showing that defense counsel's representation fell below an objective standard of reasonableness or was outside the range of competence demanded of attorneys in criminal cases. *Hill*, 474 U.S. at 56-59. The prejudice-prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59.

14

The petitioner must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*; see also *Smith v. United States*, 348 F.3d 545, 551-552 (6th Cir. 2003).

The Sixth Circuit has interpreted *Hill* to require a federal habeas court to analyze the substance of the habeas petitioner's underlying claim or defense to determine whether, but for counsel's error, the petitioner would likely have gone to trial instead of pleading guilty. See *Maples v. Stegall*, 340 F. 3d 433, 440 (6th Cir. 2003). A petitioner therefore has the burden to show a reasonable probability that but for counsel's errors, he would not have pled guilty, because there would have been a reasonable chance that he would have been acquitted had he insisted on going to trial. *Heximer v. Woods*, 2013 U.S. App. LEXIS 26390 (6th Cir. May 23, 2013) (Petitioner could not show prejudice under *Hill* where his affirmative defense of entrapment would not have succeeded at trial); *Garrison v. Elo*, 156 F. Supp. 2d 815, 829 (E.D. Mich. 2001).

Petitioner initially argues that he is not required to show actual prejudice because trial counsel rendered presumptively ineffective assistance under *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court recognized three situations in which Sixth Amendment violations are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658. The first situation occurs when the accused "is denied counsel at a critical stage of his trial." *Id.* at 659. The second situation occurs when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* However, in order for a presumption of prejudice to arise based on

15

an attorney's failure to test the prosecutor's case, the attorney's failure "must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002). The third situation occurs under circumstances "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 659-60.

It is a rare case in which a *Cronic* violation will be found for want of adequate pretrial preparation. See *Johnson v. Bradshaw*, 205 F. App'x 426, 432-33 (6th Cir. 2007). Such a "constructive denial of counsel is limited to situations involving constitutional error of the first magnitude, which cannot be cured even if no prejudice is shown." *Moss v. Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002). Here, even assuming as true Petitioner's allegations that Slameka only briefly met with him and failed to interview witnesses, the record shows that he was familiar with witness statements, examined witnesses during the preliminary examination, and participated in pretrial hearings. This of course does not mean that Slameka's performance passes constitutional muster, but it does mean that his performance was not per se prejudicial under *Cronic*. Petitioner must therefore demonstrate how Slameka's performance prejudiced him under *Hill* in order to be entitled to relief. See *Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. Mich. 2007).

Here, in light of all the evidence proffered by Petitioner to the Court, he has not shown a reasonable likelihood that he would have elected to stand trial and received a more favorable result instead of accepting the plea offer. There were four people other than

16

Petitioner who witnessed the incident: Godboldo, Starks, Skinner, and Williams. None of these witnesses would have provided Petitioner with a substantial defense such that there is a reasonable likelihood that he would have insisted on going to trial and received a more favorable result. *Garrison*, 156 F. Supp. at 829.

Godboldo testified both at the preliminary examination and pursuant to the investigative subpoena that when Petitioner pulled out his gun, the victim backed away with his hands up. Petitioner then pointed the gun at him and fired five times. She testified that the victim had pushed Petitioner, but he backed off as soon as Petitioner produced the gun. Likewise, Starks testified pursuant to the investigative subpoena that the victim pushed Petitioner, but that he stepped back with his hands out when Petitioner produced the gun. She did testify during the investigative subpoena proceeding that Petitioner shot towards the ground, but in her police statement she stated that Petitioner pointed the gun at the victim.

Skinner, who Petitioner claims would have supported his defense, would not have provided favorable testimony. She did tell police that the victim pushed and shook Petitioner, but she also described how the victim stepped back when Petitioner drew his gun. She also told police that Petitioner aimed the gun at the victim's mid-section and fired it three times. Williams, on the other hand, only told police that "it looked like" Petitioner was pointing the gun at the ground, but she also described how the victim let Petitioner go before Petitioner fired multiple shots.

Accordingly, all the witnesses agreed on the same general scenario: the victim and Petitioner were arguing, the victim pushed and/or shook Petitioner after Petitioner said

17

something, Petitioner pulled out a gun, the victim backed away, and Petitioner fired multiple shots from close range. Two witnesses saw Petitioner point the gun at the victim when he fired, and the physical evidence of course confirmed that the victim was directly shot. One witness gave conflicting statements about whether Petitioner aimed the gun at the victim, and the remaining witness thought "it looked like" Petitioner aimed at the ground.

While it is true that Petitioner told police he fired shots into the ground to scare the victim, the fact remains that all of the witnesses saw him fire multiple shots from close range after the victim backed away. And two of the four eyewitnesses–including the one Petitioner claims should have bee used in his defense–were firm about the fact that Petitioner aimed at the victim. Based on a review of all the record evidence, the Court finds that there is not a reasonable likelihood that had Petitioner stood trial he would have received a more favorable outcome. His defense of accident or self-defense was not as strongly supported by the eyewitness accounts as he claims. Accordingly, even assuming that trial counsel performed deficiently in failing to investigate and pursue a defense, Petitioner has not demonstrated that he was prejudiced.

The Court notes that there can be no question that the relationship between Slameka and Petitioner was a poor one. Any fair reading of the August 14, 2009, pretrial hearing indicates that the two had differing ideas on how to proceed. The comments made by defense counsel at this hearing were unnecessary and gratuitous and held no discernable benefit for Petitioner. Defense counsel merely vented to the trial court that his client was being unreasonable in failing to accept the plea offer.

18

Counsel indicated at the hearing that Petitioner had made incriminating statements during recorded phone calls from jail that undermined the defense. While Petitioner claims that his counsel should have kept this information private, it is clear from the record that defense counsel learned of the phone calls from the prosecutor, who provided him with copies of the recordings. Thus, while the Court deems counsel's conduct at this hearing to be worthy of criticism and unprofessional, it did not prejudice Petitioner.

Moreover, it is worth noting that at the August 17, 2009, pretrial proceeding the dispute between counsel and Petitioner was not about whether to stand trial or accept the plea offer. Rather, the record indicates that Petitioner was awaiting a better plea offer, and defense counsel did not believe a better offer would be made. In fact, Petitioner was correct, and he received and accepted a more favorable plea bargain on the eve of trial. In light of this record, Petitioner has not shown a reasonable probability that he would have stood trial but for his counsel's deficient performance. The record shows instead that Petitioner was desirous of obtaining a plea bargain and was waiting to accept one that he deemed more favorable.

Finally, the record shows that trial counsel was familiar with Godboldo and Starks' statements to police. Counsel also referred to Skinner's statement at a pretrial hearing. As explained above, all these witnesses at a minimum saw Petitioner fire multiple shots from close range after being pushed and/or shaken by Petitioner. Given all the eyewitness accounts and given "that, according to Petitioner's own [statement] that he responded to being hit . . . . by firing numerous gunshots, counsel could have reasonably concluded that a self-defense

19

theory would not have been persuasive at trial." *Durr v. Haas*, 2015 U.S. Dist. LEXIS 144594, 9-10 (E.D. Mich. Oct. 26, 2015).

Finally, the Court concludes that Petitioner's plea was otherwise validly entered and not the product of coercion by his counsel as he claims. To satisfy due process a criminal defendant's guilty plea must be made knowingly, intelligently, and voluntarily. *United States v. Broce*, 488 U.S. 563 (1989); *Boykin v. Alabama*, 395 U.S. 238 (1969). A plea is intelligent and knowing where there is nothing to indicate that the defendant is incompetent or otherwise not in control of his or her mental faculties, is aware of the nature of the charges, and is advised by competent counsel. *Id*. at 756. The plea must be made "with sufficient awareness of the relevant circumstances and likely consequences." *Id*. at 748. A plea is voluntary if it is not induced by threats or misrepresentations and the defendant is made aware of the direct consequences of the plea. *Brady v. United States*, 397 U.S. 742, 755 (1970). The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it." *Id*. at 749.

The record of Petitioner's plea proceeding shows that it was validly entered. As stated, the record indicated that Petitioner was aware of Skinner's statement, and he obviously heard Godboldo's testimony. Petitioner was aware of the nature of the charges against him. The parties and the trial court discussed the terms of the plea agreement and its consequences at the plea hearing. Petitioner was informed of all the trial rights he would be waiving by entering his plea. The record indicates that Petitioner understood what he was doing, and that it was his desire to plead guilty. He is bound by those statements. Where, as here, the trial

20

court scrupulously followed the required procedure, Petitioner is bound by his statements in response to that court's inquiry. *Ramos v. Rogers*, 170 F.3d 560, 566 (6th Cir. 1999) (quoting *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986)).

Accordingly, Petitioner has failed to demonstrate entitlement to relief with respect to any of his claims, and the petition will be denied.

## IV. Conclusion

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. See 28 U.S.C. ' 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. ' 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if Petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing ' 2254 Cases, Rule 11(a), 28 U.S.C. foll.' 2254.

Petitioner has demonstrated a substantial showing of the denial of a constitutional

right with respect to his claim that his plea was rendering involuntary by the ineffective assistance of his trial counsel. A reasonable jurists might debate whether the Court correctly denied relief with respect to this claim. Accordingly, a certificate of appealability will issue as to this claim. The Court will also grant Petitioner permission to proceed on appeal in forma pauperis. *See Foster v. Ludwick*, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002); 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a).

V

Accordingly, it is ORDERED that the petition for writ of habeas corpus is DENIED.

It is further ORDERED that a certificate of appealability is GRANTED with respect to Petitioner's ineffective assistance of trial counsel claim.

It is further ORDERED that Petitioner may proceed in forma pauperis on appeal.


S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: September 20, 2016

I hereby certify that a copy of the foregoing document was served upon parties/counsel of record on September 20, 2016, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Assistant